## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARY LOU SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 12-278 |
| v. | ) | |
| | ) | Chief Judge Gary L. Lancaster |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | Electronic Filing |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER

Mary Lou Smith ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking

review of the final determination of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying her application for disability insurance benefits ("DIB") under Title II

of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"). This matter comes before the court

on cross motions for summary judgment. (ECF Nos. 8, 10). The record has been developed at

the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment

will be DENIED, and Defendant's Motion for Summary Judgment will be GRANTED.

### I.    PROCEDURAL HISTORY

Plaintiff filed for DIB with the Social Security Administration on October 27, 2008,

claiming an inability to work due to disability as of September 1, 2008.  (R. at 107 – 08)[1].

Plaintiff was initially denied benefits on January 23, 2009.  (R. at 57 – 61).  A hearing was

---

[1]    Citations to ECF. Nos. 6 – 6-12, the Record, *hereinafter*, "R. at __."

scheduled for June 23, 2010, and Plaintiff appeared to testify, represented by counsel. (R. at 30 – 55). A vocational expert also testified. (R. at 30 – 55). The Administrative Law Judge ("ALJ") issued her decision denying benefits to Plaintiff on September 14, 2010. (R. at 9 – 29). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on February 14, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed her Complaint in this court on March 6, 2012. (ECF No. 4). Defendant filed his Answer on May 14, 2012. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 10).

## II.     STATEMENT OF THE CASE

Plaintiff was born on August 18, 1961 and was forty eight years of age at the time of her administrative hearing. (R. at 37). Plaintiff was a high school graduate. (R. at 38). She was married, and resided with her husband, adult son, and brother-in-law in a mobile home. (R. at 38). Plaintiff's husband was disabled and her son was insulin dependent. (R. at 42). She provided care for her husband, and performed household chores such as laundry, cooking, and cleaning. (R. at 42 – 43). Plaintiff maintained a driver's license and was capable of traveling independently, as well as caring for herself without difficulties. (R. at 42). She spent most of her day watching television. (R. at 42). Plaintiff's previous employment included stints as a laborer, cashier, and in-home caretaker. (R. at 136). However, Plaintiff had been unemployed since 2003-2004, and had at times subsisted on welfare benefits from the state. (R. at 38, 49). She also received medical assistance. (R. at 38).

Plaintiff claimed that she was unable to work on a full-time basis as a result of back, knee, and shoulder pain, wrist numbness, lupus, anxiety, depression, lung effusions, sleep apnea, anemia, irritable bowel syndrome, hernia, obesity, and migraines. (R. at 39, 41, 44 – 49, 135). Her health allegedly began to decline following a fall that resulted in a punctured lung. (R. at 39). The record provides a lengthy history of treatment with various medical professionals for these conditions.

Records from visits with Plaintiff's chiropractor in 2007 revealed that she frequently complained of neck and upper back pain. (R. at 177 – 78). Plaintiff considered the pain to be severe. (R. at 177 – 78). Tenderness was found upon physical examination and palpation of the cervical and thoracic spine. (R. at 177 – 78). Spinal adjustments were made, and Plaintiff was diagnosed with nonallopathic lesions of the cervical region, cervicalgia, tension headache, nonallopathic lesions of the thoracic region, and thoracic spine pain. (R. at 177 – 78).

Plaintiff began seeing neurologist Michael K. Sauter, M.D. in 2002. (R. at 182). At the time, she complained of debilitating migraine headaches. (R. at 182). Plaintiff was placed on prescription medication for treatment, and saw significant improvement in her symptoms over time. (R. at 182 – 84). Stress was noted to exacerbate her symptoms. (R. at 182 – 84). She also endorsed difficulty with sleep. (R. at 182 – 84). Plaintiff was generally noted to be well-appearing and in no acute distress, however. (R. at 182 – 84). Following the initiation of treatment for sleep apnea in 2007, Plaintiff saw further improvement in her migraine headaches. (R. at 185). She still complained of headaches approximately twice a week, without aura, but with some photosensitivity, sonophoboia, and nausea. (R. at 186). Dr. Sauter suggested that Plaintiff exercise four to five times per week and decrease caffeine intake to help with her headaches and improve her overall health. (R. at 186). As of January 2010, Plaintiff was "pretty

good," and reported that her headaches were relieved promptly with the use of prescription pain medication and ice packs. (R. at 404). She was noted to be well-appearing. (R. at 404). Her migraines were considered to be well controlled. (R. at 404).

Polysomnography testing was conducted in July and August 2007, and resulted in diagnoses of mild obstructive sleep apnea. (R. at 188 – 97). It was recommended that Plaintiff lose weight, change her sleep position to maximize breathing, and use a CPAP machine at night while asleep. (R. at 188 – 97). A stress test, myocardial perfusion imaging, and an echocardiogram in July 2007 demonstrated difficulty maintaining a high level of activity and evidence of pleural effusion, but also showed normal blood pressure response to exercise, mostly normal ventricular size and functioning, mild tricuspid and mitral regurgitation, and no evidence of ischemia or infarction. (R. at 207 – 10). Plaintiff was diagnosed with dyspnea. (R. at 217). Plaintiff's heart, lungs, pleura, mediastinum, and bones were unremarkable in chest x-rays conducted in October 2007 and February 2008, and her pleural effusions had resolved. (R. at 198 – 99, 246).

Plaintiff was treated by Hyoung D. Kim, M.D. from August 2007 through February 2009 for iron deficiency anemia. (R. at 316 – 18). He prescribed supplements to boost her iron levels. (R. at 316 – 18, 381 – 83). No further treatment was necessary.

Rheumatologist Dawn Marie Santora, M.D. examined Plaintiff in September and October 2007 due to symptoms suggestive of lupus. (R. at 240 – 45). Based upon symptomology and blood tests, Dr. Santora concluded that Plaintiff either suffered from mild systemic lupus erythematosus and/ or an overlap between Sjogren syndrome and lupus. (R. at 240 – 45). At a follow-up in July 2008, Dr. Santora noted that Plaintiff was doing quite well on her prescription medication for treatment of lupus, and reported no arthralgia, arthritis, or morning stiffness. (R.

4

at 263). Plaintiff also denied shortness of breath or chest pain. (R. at 263). Upon physical examination, no tenderness was found over the cervical, thoracic, or lumbar spine. (R. at 263). Plaintiff had full range of motion in her extremities, but was limited by tenderness in the left shoulder. (R. at 263). In January 2010, Dr. Santora noted that Plaintiff was still doing well with her lupus treatment. (R. at 370). Plaintiff was in no acute distress. (R. at 370). There was no tenderness over the cervical, thoracic, or lumbar spine. (R. at 370). Plaintiff's neck and shoulders were asymptomatic. (R. at 370). Her knees did exhibit some tenderness. (R. at 370). Plaintiff also exhibited symptoms indicative of mild carpal tunnel. (R. at 370).

An esophagogastroduodenoscopy conducted in March 2008 revealed that Plaintiff's esophagus, stomach, and duodenum were all normal, with the exception of a small hiatus hernia. (R. at 256). A colonoscopy conducted the same month revealed mild diverticulosis, but otherwise was unremarkable. (R. at 259). No further actions were taken with respect to the results of these studies.

Nabil Jabbour, M.D. examined Plaintiff on behalf of the Bureau of Disability Determination on January 5, 2009. (R. at 339 – 41). Dr. Jabbour noted Plaintiff's diagnoses of anxiety and depression, sleep apnea, lupus, back pain, and shoulder pain. (R. at 339 – 41). Plaintiff was initially observed to be alert, oriented, and cooperative. (R. at 339 – 41). Physical inspection revealed normal pulse and respiration, tenderness in the lumbar spine, some restriction in movement of the left shoulder, inability to do a full squat, and an otherwise normal physical examination with full range of motion and no sensory or motor deficits. (R. at 339 – 41).

A Psychiatric Review Technique was completed by state agency evaluator Michelle Santilli, Psy.D. on January 13, 2009. (R. at 346 – 58). Dr. Santilli noted Plaintiff's limited psychiatric treatment history despite her diagnoses of anxiety and depression. (R. at 346 – 58).

Plaintiff was prescribed medication for her conditions by Dr. Sauter, but nothing more. (R. at 346 – 58). Dr. Santilli considered Plaintiff to suffer from a depressive disorder and anxiety disorder. (R. at 346 – 58). A review of the medical record led Dr. Santilli to conclude, however, that Plaintiff exhibited only mild limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (R. at 346 – 58). There was no history of decompensation of extended duration. (R. at 346 – 58).

State agency evaluator Kenneth Keafer completed a Physical Residual Functional Capacity Assessment ("RFC") on January 23, 2009, based upon a review of Plaintiff's medical record. (R. at 359 – 65). He determined that there was sufficient evidence to support a finding of severe impairment in the form of anemia and lupus. (R. at 359 – 65). He noted that the record showed normal heart and lung functioning, full range of motion in the joints without swelling or tenderness, intact sensation, and the ability to walk on heels and toes. (R. at 359 – 65). Plaintiff's reported activities of daily living were fairly extensive, her medical treatments were conservative in nature, and she was able to interact well with others. (R. at 359 – 65). Mr. Keafer believed that Plaintiff would be physically limited to occasional lifting and carrying of fifty pounds, frequent lifting and carrying of twenty-five pounds, standing and walking approximately six hours per day, and sitting six hours per day. (R. at 359 – 65). Plaintiff was not otherwise limited.

On April 22, 2010, Dr. Sauter completed an evaluation of Plaintiff's functional capacity. (R. at 396 – 403). He noted that throughout his treatment of Plaintiff's migraine pain, she made good progress. (R. at 396 – 403). Her headaches were not considered to be an impediment to her ability to work. (R. at 396 – 403). His prognosis was good. (R. at 396 – 403). He felt that Plaintiff neither met a disability listing, nor qualified as permanently disabled. (R. at 396 – 403).

He believed that Plaintiff was capable of full-time work.  (R. at 396 – 403).  Dr. Sauter specifically found that Plaintiff could sit, stand, walk, and drive for up to eight hours per day, that she could frequently lift twenty-one to fifty pounds, and occasionally lift up to one hundred pounds.  (R. at 396 – 403).  She had no limitation in the way of grasping, pushing and pulling, or fine manipulation.  (R. at 396 – 403).  Plaintiff would not require frequent rest periods or miss work due to pain.  (R. at 396 – 403).

Consultative examiner Lindsey Groves, Psy.D. evaluated Plaintiff's functional capacity on April 27, 2010.  (R. at 406 – 16).  Dr. Groves noted Plaintiff's past diagnoses of lupus, depression, anxiety, and irritable bowel syndrome.  (R. at 406 – 16).  Based upon her examination of Plaintiff, Dr. Groves diagnosed recurrent, moderate major depressive disorder and anxiety disorder.  (R. at 406 – 16).  Plaintiff never sought mental health treatment, but Dr. Sauter was noted to have prescribed psychiatric medication.  (R. at 406 – 16).  There were no complications resulting from these disorders that required frequent care; however, Dr. Groves' prognosis was highly guarded due to the lack of formal mental health treatment.  (R. at 406 – 16).  She considered Plaintiff to be seventy percent permanently disabled, and that she could not engage in full-time employment due to her mental condition.  (R. at 406 – 16).  She anticipated that Plaintiff would miss work approximately twice per month.  (R. at 406 – 16).  Plaintiff informed Dr. Groves that she had initially stopped working to care for her disabled husband.  (R. at 406 – 16).  She believed that she could not return to work because of pain.  (R. at 406 – 16).  Dr. Groves' specific findings included marked limitation in activities of daily living and maintaining social functioning, moderate limitation in maintaining concentration, persistence, and pace, and four or more past episodes of decompensation of extended duration.  (R. at 406 –

16). Plaintiff had poor/ no ability to deal with work stresses. (R. at 406 – 16). Dr. Groves did not conduct any testing to support her conclusions. (R. at 406 – 16).

In August 2007, Plaintiff's primary care physician Karen A. Lang, M.D., completed a Pennsylvania Department of Public Welfare Employability Assessment Form indicating that Plaintiff was temporarily disabled from July 2007 until she would be able to undergo gastric bypass surgery, due to sleep apnea, pleural effusion, and morbid obesity. (R. at 222). On May 10, 2010, Dr. Lang also completed an assessment of Plaintiff's functional capacity. (R. at 417 – 22). She noted that Plaintiff had been diagnosed with lupus, arthritis, anemia, anxiety, depression, migraines, and shoulder impingement. (R. at 417 – 22). Dr. Lang indicated that Plaintiff's joint pain was her most limiting condition. (R. at 417 – 22).

She did not indicate whether Plaintiff would be permanently disabled, or whether she met a listing under the Act, but did opine that working would be difficult due to symptoms of arthritis and lupus. (R. at 417 – 22). Dr. Lang specifically noted that Plaintiff would be limited to sitting four hours per day, standing two hours, walking one hour, and driving one hour. (R. at 417 – 22). Plaintiff could occasionally lift up to twenty pounds, but could never lift more, and Plaintiff could not engage in fine manipulations. (R. at 417 – 22). Crawling and climbing were not possible, and bending, squatting, and reaching above shoulder level could only be completed occasionally. (R. at 417 – 22). Plaintiff would also have mild difficulty with unprotected heights. (R. at 417 – 22). Plaintiff's pain was generally believed to be moderate, but she would frequently require rest periods during the day, and would miss work frequently. (R. at 417 – 22).

III.   **STANDARD OF REVIEW**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler*, 786 F. 2d 581, 583 (3d Cir. 1986).   When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003).   If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues.  42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v.*

---

[2]       Section 405(g) provides in pertinent part:

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial

---

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]    Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

10

evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## IV.   DISCUSSION

The ALJ concluded that Plaintiff had medically determinable severe impairments in the way of migraine headaches, obstructive sleep apnea, obesity, lupus, anemia, left shoulder impingement syndrome, mild carpal tunnel syndrome, degenerative joint disease of the right knee, irritable bowel syndrome, hernia, anxiety, and depression. (R. at 11). In spite of these impairments, Plaintiff was determined not to meet any listings at Step 3, specifically, 11.02, 14.02, 12.04, and 12.06. (R. at 12). It was also determined at Step 5 that Plaintiff was not ultimately disabled, because – based upon the record – she had the functional capacity to perform light work. (R. at 15).

The light work would be restricted in that Plaintiff could not lift more than twenty pounds occasionally, could sit no more than four hours and stand/ walk no more than three hours in an eight hour work day, excluding regularly scheduled breaks, was limited to frequent, but not constant, fine manipulation, occasional bending, squatting, and overhead reaching, and could not crawl, climb, or be exposed to unprotected heights. (R. at 15). She was further limited to no more than simple work requiring understanding, remembering, and carrying out simple instructions and making only simple work-related decisions. (R. at 15). As per the testimony of the vocational expert, a significant number of jobs existed in the national economy which could be performed by a person with Plaintiff's limitations. (R. at 24 – 25).

Plaintiff objects to the determination of the ALJ, arguing that she erred in failing to find Plaintiff disabled under Listings 3.10 (sleep-related breathing disorders) and 14.02 (systemic lupus erythematosus), in improperly discrediting the disability assessment of Dr. Lang based solely upon the findings of state agency evaluator Keafer, and by failing to account for limitations imposed by Plaintiff's obesity – thereby rendering the ALJ's RFC and hypothetical to the vocational expert impermissibly incomplete. (ECF No. 9 at 3 – 4, 16 – 22). Defendant counters that the ALJ adequately addressed listings under which Plaintiff may have had a viable claim, and thoroughly considered all impairments and resulting limitations, supporting her ultimate determinations with substantial evidence. (ECF No. 11 at 12 – 19). This court is inclined to agree.

While Plaintiff is correct that the ALJ neither explicitly identified nor discussed Listing 3.10, this is not dispositive. It is the established law of this circuit that as long as the ALJ's decision – when read as a whole – reveals that the ALJ considered the appropriate facts when deciding that a claimant did not meet any specific disability listings, the ALJ's determination is supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). The ALJ must adequately develop the case record and discuss the findings supporting his or her conclusion that none of the listings at Step 3 are met. *Id.* at 504 – 05 (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 – 20 (3d Cir. 2000)). However, in so doing, the ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis." *Id.* at 505. *See Scatorchia v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 468, 470 – 71 (3d Cir. 2005) (An ALJ satisfies *Jones* and *Burnett* "by clearly evaluating the available medical evidence in the record and then setting forth the evaluation in an opinion, even where the ALJ did not identify or

analyze the most relevant listing."); *Scuderi v. Comm'r of Soc. Sec.*, 302 Fed. App'x 88, 90 (3d Cir. 2008) ("[A]n ALJ need not specifically mention any of the listed impairments.").

Listing 3.10 states that sleep-related breathing disorders are evaluated under the criterion for Listing 3.09 (chronic cor pulmonale) or 12.02 (organic mental disorders). 20 C.F.R., Pt. 404, Subpt. P, App'x 1. Plaintiff fails to identify which listing would be most appropriate for analysis of her sleep apnea, and further fails to provide evidence which would indicate that her sleep apnea meets each of the requirements under Listing 3.09 and/ or 12.02. The burden is upon Plaintiff to provide proof that the listing was met. "For a claimant to show his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Jones*, 364 F. 3d at 504 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Plaintiff's blanket assertion of qualification under 3.10 is insufficient to justify remand for analysis of her sleep apnea under said listing.

With respect to a finding of disability under Listing 14.02, Plaintiff must provide evidence which shows:

A. Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and
2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R., Pt. 404, Subpt. P, App'x 1.  Plaintiff asserts that she met Listing 14.02B – which the ALJ failed to explicitly analyze – because evidence shows that not only did she experience severe fatigue and malaise, but she also had marked levels of limitation in activities of daily living and in maintaining social functioning.  Drs. Groves and Lang's functional assessments are cited as support.

While the ALJ did not explicitly discuss her rejection of Listing 14.02, as discussed above, she did not need to do so.  Based upon a reading of her discussion as a whole, there is substantial evidence to support the ALJ's rejection of disability under 14.02.  While it is arguable whether or not the record supports Plaintiff's contention that she experienced both severe fatigue and malaise, the ALJ was justified in rejecting findings indicating that Plaintiff had the requisite marked limitations.

A treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)).  A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Brownawell*, 554 F. 3d at 355.  Moreover, a medical opinion is not entitled to any

weight if unsupported by objective evidence in the medical record. *Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).

In his opinion, Dr. Sauter – a neurologist having treated Plaintiff for migraines, anxiety, and depression for the better part of a decade – made no findings of such marked limitations. The ALJ explicitly relied upon this opinion, as well as the psychiatric review technique of Dr. Santilli. (R. at 14 – 15, 12 – 23). The ALJ was entitled to do so, and explained at length that the medical evidence as a whole favored Drs. Sauter and Santilli's assessments, and Plaintiff made inconsistent statements regarding difficulties with activities of daily living and social functioning. (R. at 14, 19). Plaintiff, in fact, had extensive activities of daily living – providing care for her disabled husband, running her household, and caring for herself. She testified that she had no difficulty socializing and getting along with others, except when they act angrily towards her. (R. at 41, 46). Based upon this evidence, the ALJ's rejection of disability under 14.02 was properly supported. Further, as it concerns her general rejection of the more severe findings of Drs. Groves and Lang with respect to Plaintiff's functional capacity, the ALJ was justified in relying instead upon Drs. Sauter, Santora, and Santilli, and Mr. Keafer, who – as discussed by the ALJ at length – presented findings more in-line with the objective medical evidence on record. (R. at 21 – 23).

Lastly, to the extent that limitations stemming from Plaintiff's obesity may have affected the ALJ's findings at either Step 3 or Step 5, Plaintiff fails to point to medical sources which attributed specific limitations to Plaintiff's obesity which were not accommodated by the ALJ. Simply having an impairment is not enough to justify remanding a case if no limitations attributable to the impairment could alter the outcome of the case. *See Rutherford v. Barnhart*, 399 F. 3d 546, 553 (3d Cir. 2005) ("[A]ny remand for explicit consideration of Skarbeck's

obesity would not affect the outcome of the case. Rutherford has not specified how that factor would affect the five-step analysis undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers. That generalized response is not enough."). The ALJ discussed Plaintiff's obesity, and could not find objective medical evidence that it was responsible for limitations beyond those in his hypothetical. (R. at 13, 16 – 17). Plaintiff fails to provide objective evidence to the contrary. Her claim that the ALJ's analyses at Step 3 and 5 were incomplete, as a result, is unfounded and does not warrant remand or reversal.

## V.   CONCLUSION

Based upon the foregoing, the court finds that substantial evidence supported the determination by the ALJ. Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [ECN No. 8] is DENIED, Defendant's Motion for Summary Judgment [ECF No. 10] is GRANTED, and the decision of the ALJ is AFFIRMED.

_____
Hon. Gary L. Lancaster,
Chief United States District Judge

1/22/13

cc/ecf: E. David Harr, Esq.
203 South Main Street
Greensburg, PA 15601
(724) 834-9124

Michael Colville, Esq.
United States Attorney's Office
700 Grant Street
Suite 4000
Pittsburgh, PA 15219